**Doris M. HUGHES, Plaintiff,**

v.

**Elliot RICHARDSON, Secretary of Health, Education, and Welfare, Defendant.**

**Civ. A. No. 19207-3.**

United States District Court,
W. D. Missouri, W. D.

Aug. 20, 1971.

As Amended Nov. 30, 1971.

James W. Humphrey, Jr., Kansas City, Mo., for plaintiff.

Paul Anthony White, Asst. U. S. Atty., Kansas City, Mo., for defendant.

JUDGMENT REVERSING JUDGMENT OF DEFENDANT DENYING DISABILITY BENEFITS TO PLAINTIFF AND AWARDING BENEFITS FROM JUNE 30, 1968

WILLIAM H. BECKER, Chief Judge.

This is an action under Section 405 (g), Title 42, United States Code, for review of a disability determination made by defendant on January 28, 1971, denying plaintiff's claim for disability benefits under §§ 416 and 423, Title 42, United States Code. Plaintiff's petition for review was filed in this Court on March 17, 1971.

Plaintiff originally filed her application for disability benefits on April 24, 1969. The claim was denied by the Social Security Administration on initial consideration and again on reconsideration. On February 27, 1970, at plaintiff's request, a hearing was held, and the hearing examiner, on April 22, 1970, entered his decision against the plaintiff. After receiving additional evidence, the Appeals Council of the Social Security Administration rendered a decision on January 28, 1971, denying plaintiff's claim. The decision of the Appeals Council stands as the final decision of the Secretary.[1]

The standards of disability applicable in these proceedings are those set out in Sections 416(i) (1) and 423(d) (1) of Title 42, United States Code, which read as follows:

"The term 'disability' means—

"(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; . . . ."

It is plaintiff's contention that she meets this standard because, she contends, she became unable to work on June 30, 1968, because of painful degenerative disc and arthritic conditions in her right arm. The defendant concedes that plaintiff met "the special earnings requirements of the Act at all pertinent times."

THE EVIDENCE OF RECORD

A review of the evidence which was considered by the hearing examiner and Appeals Council in denying disability benefits shows the following:

*The Medical Evidence*

(1) "Medical Report" of Selbert G. Chernoff, M.D., dated April 29, 1969, listing under "history":

"Arthritis, right arm, approximately 9 months, involving elbow, shoulder, hand";

and under "findings":

"Tenosynovitis of right elbow extensors, flexors, supinator—all involved. Mild bursitis of right shoulder also.

"Given Butzolidin, an anti-inflammatory medication, restricted use of hand, injected elbow and shoulder with mixed steroids." (Tr. 80–81)

(2) "Medical Report" of Thomas A. Janes, D.C., dated June 9, 1969, stating as follows:

"Mrs. Doris M. Hughes, 1613 Lister, Kansas City, Missouri, first consulted Pennell Chiropractic Clinic on January 21, 1969 complaining of intermittent episodes of pain and discomfort of the right arm and shoulder as well as restriction of flexion, extension and/or rotation of the arm. She stated that she was gainfully employed as a legal secretary but that because of the condition of her arm and

---

1. Defendant admits this in the brief filed herein on June 10, 1971.

shoulder, she was unable to continue working and had been forced to give up her job last June.

"Mrs. Hughes stated she had consulted a Dr. Chernoff (sp. ?) in December 1968 for what he had diagnosed as a tennis elbow. She related a history of bursitis 'years ago' and said her present symptoms recurred 8 months prior to her consulting our Clinic, and that they had grown worse steadily since. She further stated she had, in the past, been involved in an automobile accident; that 17 years ago she received treatment from an osteopath for leg cramps. Years ago, fractured some fingers of right hand.

"In connection with her present complaints, Mrs. Hughes states her daily activities are now sharply limited; that her shoulder problem is not as acute as her arm, especially her elbow, and that the condition is alleviated when she assumes a reclining position or recumbent position.

"She was examined and x-rayed. Treatment consisted of chiropractic adjustments and physiotherapeutic treatment to reduce the subluxations found in cervical, dorsal and lumbar vertebrae, and to ease pain and discomfort.

"The patient responded slowly though steadily to care and by April 17, 1969, we had achieved a maximum extent of correction. However, a permanent residual weakness appears to be a definite possibility. We have recommended management care on the basis of one treatment per month.

"The patient is a well developed, well nourished white female appearing the stated age of 39 years.

"X-ray revealed degenerating disc between the 5th and 6th cervical vertebrae with loss of normal curvature. Beginning arthritis is encountered in the region of the 5th and 6th cervical verbetrae (sic), as well as in the area of the 11th dorsal and 1st lumbar vertebrae. We believe the underlying cause of the patient's problem is nerve pressure of a severe and chronic nature. There is very definite likelihood of nerve damage. However, the condition suffered by Mrs. Hughes without question has more than one cause and is far advanced. The disc problem has resisted all efforts to bring about an increase in the disc space although we have been able to save the involved cervical vertebrae from complete collapse.

"Blood pressure, temperature, pulse and respirations all within normal limits. Gross examination of eyes, ears, nose and throat revealed nothing of significance. Eyes react to light and accommodation. By stethoscope, heart rate and rhythm sound normal. Lung fields are clear to ausculation and percussion. Upper and lower extremities are normal in size and contour. Reflexes are normal. Examination of the spine for areas of spinal soreness and tenderness disclose two such areas: at the 7th cervical and at the Atlas vertebra, right. Palpation of the sternocleido musculature, right side, brings forth complaints of tenderness and soreness from the patient. No other findings of note on examination."

\*    \*    \*    \*    \*    \*

"Radiographic studies from x-ray pictures taken January 21st disclosed subluxations of cervical vertebrae (4th and 5th posterior), and pathologically the disc space between the 5th and 6th cervicals is lessened. Specifically subluxations are located not only at the level of the 4th and 5th cervical but also involving the 2nd dorsal and 5th lumbar, with impingement on nerve roots and nerves which could affect the neck, arms and legs.

"Orthopedic and Neurologic examinations revealed cervical extension to be somewhat diminished and the right sternocleido musculature spasmed and sore. Wharburton test: negative to both arm and neck.

IV. DIAGNOSES:

1. Subluxation of the 5th Cervical and 2nd Dorsal vertebrae causing neu-

**324**

ritis and neuralgia of the brachial plexus, right.

\* \* \*

3. Beginning arthritis."

(3) Letter of July 2, 1969, of Bernard M. Abrams, M.D., to Walter Killilae, Counselor, OASI Disability Determinations, stating as follows:

"I examined the above captioned patient at your request on 2 July 1969. "She is a 39 year old, right handed, white lady with a chief complaint of pain in the biceps and triceps muscles of the right upper extremity, radiating in dull fashion down the right upper extremity, occasionally as a sharp pain in the fingers. This is very incapacitating to her because she used to be a legal stenographer and take shorthand. The patient's trouble arose insidiously about a year ago while she was taking birth control pills. She went to her physician and he stated this could not have anything to do with birth control pills. At the same time, however, the patient has had a suggestion of Raynaud's phenomenon for a long time on plunging her hands into cold water. The patient states that the pain waxed and waned for a while and then became a kind of chronic dull ache down the right arm, especially on pronation or supination of the arm. The patient could not raise her arm above her head. The patient was treated by Dr. Chernoff first with 2 pills, presumably either Indocin or butazolidin (sic) and then with steroid injections and no relief resulted. The patient then went to a chiropractor, the report of whose findings you kindly sent to me. She has since been treated with manipulation and states she is somewhat better. The patient 3 to 4 years ago had a whiplash injury and had a fall about 2 years ago on her right arm.

"The examination of the patient reveals a pleasant, well developed, well nourished white lady appearing about her stated age. Her mental status reveals some hysterical type aspects to her personality and some blandness about her illness. Her cranial nerves are unremarkable. Examination of the right upper extremity reveals no swelling, heat or other abnormality and full range of passive motion. On raising the right upper extremity above the head there is some pain on full abduction and external rotation. The pulse also disappears in the right radial area when the head is turned to the left. However, no cervical rib can be palpated in the right supra-clavicular fossa and the patient states she has never had one. Except for guarding, muscle power is intact. Deep tendon reflexes are equal and active and there is no sensory abnormality in any extremity. There is no real feeling of injuration or abnormal tone in the muscles. The patient's pulses, radial and ulnar, are equal bilaterally although not exceptionally strong. Gait, station and the remainder of the neurological examination are entirely within normal limits.

"Summary and conclusions: I suggest that Mrs. Hughes had some type of fibromyocitis or tendonitis of the right ecromial bursa at the onset of her illness and that this was so severe that it caused some referred or sympathetic pain. I do not believe she has a brachial plexitis or ever had one. There are no signs of atrophy or other nerve root involvement. I think if she had been vigorously treated with steroid injection and local heat as Dr. Chernoff wished to originally, that her present status would be considerably better. In the meantime, I feel that there is some psychogenic overlay in this patient. However, she does have some pain on movement of the right upper extremity and this is her main limitation. This is, of course, an extremely limiting disability in a patient who was previously a stenographer. I give you as a final diagnosis—neurological disease: none discernable; possible neuromuscular disease: acromial tendonitis and bursitis. Progno-

sis: good. Specific limitations: As delineated above.

"I trust the above will be of some assistance to you in your determination. Thank you for the privilege of seeing Mrs. Hughes."

(4) Letter of David L. Roseboom, dated January 20, 1970, of the "Claim Department" of an unnamed insurer to plaintiff, stating:

"We are in receipt of the latest bill from Pennell Chiropractic Clinic in the amount of $113.50. On the basis of the medical report attached to it and on the basis of my discussion with Dr. Janes, it appears that this is maintenance treatment and as such is not intended to be covered under your policy. Therefore, no payment will be made on this bill."

(5) "Medical Report" of Thomas A. Janes, D. C., dated November 18, 1969, attached to Roseboom's letter, containing the following diagnosis and prognosis:

| | |
|---|---|
| "DIAGNOSIS (Describe and locate character and extent of injury): | Subluxation of the 5th Cervical and 2nd Dorsal vertebrae causing neuritis and neuralgia of the brachial plexus, right |
| OTHER IMPAIRMENTS: | State what, if any, impairment you have observed not the result of this accident |
| | Beginning arthritis |
| PROGNOSIS (Include estimate of probable permanent results): | Due to degenerating disc between the 5th and 6th cervical vertebrae with loss of normal curvature, we feel that this patient has reached the optimum in relief from her neuritis and neuralgia bearing and will continue to have a continual residual weakness" |

(6) Letter of John E. Linville, D. O., dated June 27, 1970, "To Whom It May Concern" stating as follows:

"Doris Hughes suffers from cervical spine syndrome. We have had consultation with Thomas Hunt, M.D., surgeon, and the orthopedic offices of Dr. William Benson. They are giving the patient a trial of six weeks in a cervical brace and if adequate response is noted corrective surgery will be carried out."

(7) Report of Thomas R. Hunt, M.D., dated June 3, 1970, noting that plaintiff was admitted to Research Hospital on that date with a "possible unstable cervical spine" and containing the following history and physical findings:

"CHIEF COMPLAINTS: Pains in neck, shoulders and arms

HISTORY OF PRESENT ILLNESS: Patient says that for two years she has had sharp pains in the right arm in the region of the elbow which has become progressively worse. She has also since then noticed pain in the other arm as well and in the cervical area. She has pains also in the shoulders with some pain in the upper arms. She had a whiplash injury quite some time ago from which she apparently recovered but she has had a couple of falls since that time. She complains of constant pain, particularly, in the neck and shoulders. She has pain in the neck with coughing and sneezing but no real radiating arm pain. She has pain on motion of the joints of the arm. She has been treated with Valium with slight benefit.

PAST HISTORY: No previous serious illnesses or operations. No known allergies.

REVIEW OF SYSTEMS: Negative except for above complaints

PHYSICAL EXAMINATION: Well nourished, well developed 40-year-old white female.

HEAD: Grossly normal

EYES: Some prominence of the right eye. Pupils round and react to light. Extraocular movements normal. Optic fundi negative.

EARS, NOSE AND THROAT: Negative

NECK: There was some hesitancy of motion, but essentially full range of motion. Some muscle spasm and tenderness was noted.

LUNGS: Clear to auscultation and percussion

HEART: Normal sinus rhythm; no murmurs or thrills

ABDOMEN: No organs, masses or tenderness noted.

EXTREMITIES: Pain on motion of the shoulder and elbow joints, somewhat worse on the right than on the left. She appears to have partial ankylosis of the right shoulder joint to abduction.

NEUROLOGICAL EXAMINATION: Cranial nerves are normal. No papilledema. There is no particular weakess (sic) noted in any muscle group. Deep tendon reflexes are present and essentially equal. There is no real sensory change.

Note: x-rays taken at 6400 Prospect reveal narrowing and degenerative changes of the 5th cervical interspace.

IMPRESSION:
1. Osteoarthritis cervical spine
2. Rule out arthritic change joints of upper extremities."

\*    \*    \*    \*    \*    \*

"Discharged: 8–08–70

The patient was admitted with a history of headache, neck pains, pains in the shoulders and elbows of about two years duration. This varies in intensity from time to time.

Examination suggested slight diminution of the triceps jerks bilaterally. Outside x-rays have revealed degenerative changes of C 5–6. She was admitted for investigation of this problem.

Cine-angiographs of the cervical spine revealed difficulty at the C 5–6 level. Myelogram showed no definite disc defect.

She was seen in consultation by Dr. Sandow who felt that possible anterior cervical fusion should be considered.

It was decided to put the lady in a brace for a month or so and see how she got along. If this improved her it might indicate that fusion might be helpful.

FINAL DIAGNOSIS:

Possible unstable cervical spine

*Procedure*: Myelogram"

(8) Report of T. L. Sandow, M.D., dated June 4, 1970 (during plaintiff's hospitalization in Research Hospital), containing the following findings:

"CHIEF COMPLAINT: Pain in the neck and both shoulders.

PRESENT ILLNESS: The patient is a 40 year old white female who states that two years ago she began to experience severe neck and right shoulder pain following a fall in a skating rink. The pain became so severe that the patient was unable to use her arms and hands in her work as a legal secretary and she has not worked for the past two years. The patient now states she has pain into the left shoulder and arm. The pain does not extend down in to the hands or fingers. There is no paresthesia or numbness unless the patient sleeps with the right arm up over her head and then she will experience 'numbness' of the arm. Coughing and sneezing will aggravate the pain. The patient states she has had some difficulty in sleeping. She was initially treated as a right tennis elbow with medications and injections. This did not help. The patient has also had the right shoulder injected and has had multiple chiropractic treatments including traction of the cervical spine, and manipulations. These have not relieved the discomfort, however, the patient states she

is not any worse, she just is not improved.

## PHYSICAL EXAMINATION

Full active and passive range of motion of both shoulders. Some pain in the shoulders with external rotation and abduction. The patient has a grade II limitation of the left lateral flexion and left rotation of the cervical spine. The other motions appear to be within normal limits. There is some slight diffuse tenderness over the paravertebral muscles in the cervical spine area. No discernible muscle weakness in the upper extermities and the deep tendon reflexes are present and equal. No sensory deficits. The patient does have some tenderness over the anterolateral aspect of the right shoulder and over the right lateral humeral epicondyle, however, she does not experience pain in this area with resistance to dorsiflextion of the wrist.

## IMPRESSION:

Rule out degenerative joint disc disease, cervical spine.
Rule out right subdeltoid bursitis.

## RECOMMENDATIONS:

I will review the patient's laboratory and x-ray tests and suggest further treatment at a later date."

(9) "Radiology Report" made by Arthur B. Smith, M.D., on June 4, 1970 (during plaintiff's hospitalization), containing the following findings:

"Films of the chest in frontal and lateral views show no abnormalities of the heart, lungs, mediastinum, or diaphragm. The trachea is in the midline. The costrophrenic angles are clear. There are small calcific deposits in the hilar nodes on both sides and in the periphery of the right upper lobe.

IMPRESSION: HEALED GRANU–LOMATOUS LESIONS, HILAR NODES AND RIGHT UPPER LOBE.

Films of both shoulders and upper hemeri made in frontal and lateral projections show no abnormal calcifications. There is no evidence of fracture, dislocation, or bone or joint pathology.

IMPRESSION: NORMAL RIGHT AND LEFT SHOULDERS

Films of both elbows including the lower third of each humerus and the upper half of each forearm made in frontal and lateral projections show no evidence of fracture, dislocation, or bone or joint pathology.

IMPRESSION: NORMAL RIGHT AND LEFT ELBOWS.

Cine radiographic studies of the cervical spine at the extremes of flexion and extension in the lateral projection show the narrowed fifth cervical interspace with osteoarthritic lipping on the margins of C–5 and 6. Maximum motion occurs in the upper four cervical vertebrae, particularly between C–4 and 5 with no motion between C–5 and C–6 and slight motion between C–6 and C–7. No undue range of motion is noted and no displacement of any of the bony structures occurs between the extremes of flexion and extension.

IMPRESSION: MARKEDLY LIM–ITED MOTION BETWEEN C–5 AND 6 WITH NARROWING OF FIFTH CERVICAL INTERSPACE AND OS–TEOARTHRITIC LIPPING C–5 AND 6."

(10) "Radiology Report" made by Larry P. Courter, M.D., on June 5, 1970, (during plaintiff's hospitalization) containing the following findings:

"Cervical myelographic studies using 6 cc. of Pantopaque as the contrast material shows that the opaque media flows readily throughout the length of the spinal canal. The cervical canal is well filled. No filling defects on the opaque column are seen. The cord shadow is of normal width. A transtable top lateral negative with the opaque media across the third to the sixth cervical interspaces shows no significant elevation of the opaque column.

IMPRESSION: NORMAL CERVICAL MYELOGRAM."

(11) Hospital report of plaintiff's admission to Research Hospital on August 1, 1970, with a "degen. disc & jt. disease cervical spine" and containing the following summary by T. L. Sandow, M.D.:

"CHIEF COMPLAINT: Pain in the neck, shoulders and arms, and headaches.

PRESENT ILLNESS: The patient is a 40 year old white female who states that for the past two years she has experienced sharp pain in the right arm radiating to the elbow, which has become progressively more severe. The patient also since then has noticed pain in the other arm, as well. This has been associated with neck pain and headaches. The patient has the pain radiating into both shoulder areas. She does have a history of having a 'whiplash' injury approximately 7 or 8 years ago, but apparently had recovered fully from that injury. The patient states that the present pain has been of such magnitude that she has been unable to use her arms and unable to work as a legal secretary. The patient was hospitalized at Research Hospital in June, 1970 by Dr. Hunt, and a thorough workup was performed, including a myelogram. The patient was found to have degenerative joint and disc disease at the C–5, 6 level and she was dismissed from the hospital in a cervical brace for a period of time to determine whether anterior cervical fusion should be considered. The patient wore her brace for approximately six weeks time from which she had good relief of all her symptoms. Since the discontinuing the use of the brace, these symptoms have recurred and the patient was felt to be a good candidate for anterior cervical fusion. She is readmitted to the hospital now for the same.

PAST HISTORY: The patient has had the usual childhood illnesses. A T & A at age 23. No known allergies. The patient does not take any medications.

FAMILY HISTORY: Noncontributory.

SOCIAL HISTORY: Noncontributory.

SYSTEM REVIEW:

The patient is a 40 year old white female who states that she has been in generally good health all of her life.

Head: The patient states that she has had essentially constant headaches for the past two years which appears to be associated with her neck and shoulder pain.

Eyes: The patient wears glasses at all times. No double or blurred vision.

Ears: No earaches, discharge or infection, hearing loss or tinnitus.

Nose: No epistaxis or obstruction.

Throat: No difficulty in swallowing. No pain, soreness, hoarseness or change of voice.

Respiratory: No difficulty in breathing. No chest pain, cough or hemoptysis.

Cardiovascular: The patient states that she does get short of breath fairly easily. No orthopnea, intermittent claudication or ankle edema.

Gastrointestinal: Weight steady. Appetite good. No abdominal pain, nausea or vomiting, diarrhea, constipation, melena, food allergies or intolerances.

Genitourinary: No blood or pus in the urine. No nocturia, frequency, urgency, incontinence or pain and burning on urination.

Gynecological: The patient states that her periods are irregular, flow also irregular in amount and duration.

PHYSICAL EXAMINATION: Blood pressure 110/60. Pulse 84 and regular. Resp. 20. The patient is a 40 year old white, well developed, well nourished female who appears neither acutely nor chronically ill. Skin has normal texture and turgor.

Eyes: Extraocular muscles intact. Pupils equal, round, react to light and

accommodation. Sclera and conjunctiva clear.

Throat: No injection, inflammation of posterior pharynx.

Neck: Supple. No masses. There is a Grade limitation of left lateral flexion and left rotation of the cervical spine. There is a minimal slight diffuse tenderness over the paravertebral muscles in the entire cervical spine area.

Lungs: Clear to percussion and auscultation.

Heart: Normal sinus rhythm. No murmurs, thrills or rubs.

Abdomen: Soft and nontender. Liver, spleen and kidneys not palpable. No masses palpated.

Extremities: The patient demonstrated some tenderness over the anterior lateral aspect of the right shoulder and over the right lateral humeral epicondyle. There is a full range of motion of all the joints.

Neurological: Deep tendon reflexes present and equal. No pathological reflexes. Cranial nerves intact. No sensory deficits.

IMPRESSION: Degenerative joint disc disease, cervical spine, C 5-6."

(12) Description by W. F. Benson, M.D., of an "anterior interbody fusion, C-5, C-6 interspace" performed in Research Hospital and Medical Center on August 5, 1970, reading as follows:

"This patient was admitted to the hospital on 8-1-70 for an anterior cervical fusion.

She had been seen and followed in our office previously after having undergone an injury to her neck. She has considerable difficulty with this problem from that time. She had previously been in the hospital under the care of Dr. Hunt who had done a myelogram. There were definite changes to C-5, 6 interspace and it was felt that she would profit from an anterior cervical fusion which was performed on 8-5-70.

Patient pursued an uncomplicated post-operative course. Was doing well and was able to be discharged from the hospital on 8-12-70.

DIAGNOSIS: Degenerative disc and joint disease, cervical spine, C-5, C-6 interspace.

OPERATION PERFORMED: Anterior interbody fusion, C-5, C-6 interspace."

(13) "Operative Record" made by Theodore Sandow, M. D., reading as follows: "Date of Operation: 8/5/70

"NAME OF OPERATION: Anterior cervical fusion, C 5-6, with bone graft from right anterior iliac crest

PREOPERATIVE DIAGNOSIS: Degenerative joint disc disease, C 5-6.

POSTOPERATIVE DIAGNOSIS: Same

\* \* \* \* \* \*

"DESCRIPTION OF PROCEDURE: The patient was brought into the Operating Room on a cart and transferred to the Operating Table in a supine position. A general anesthetic was administered. The patient was intubated. A sandbag was then placed beneath the right hip and between the scapulae extending to neck a head halter with traction was applied. The neck, anterior chest and right iliac were then preped and draped in the usual fashion. A 3-inch transverse incision was made in the left side of the neck in line with the skin creases approximately 2 centimeters proximal to the clavicle. The platysma was split in line with the skin incision. The interval between the carotid artery and jugular vein and the trachea and esophagus was developed. This was carried sown to the pretracheal fascia. Retractors were inserted and the interspaces between the vertebrae were identified. Needle was inserted and x-ray was taken which demonstrated needle had been inserted in the interspace between the 6th and 7th vertebra; therefore the space superior to this was identified and the en-

tire disc was excised and the disc space thoroughly curretted. A second 3-inch incision was then made directly over the right iliac crest. The crest was exposed by subperiosteal dissection. A bone graft was obtained which was approximately 1 centimeter by 1 centimeter by ½ centimeter. Twenty pounds of traction was then applied to the head halter and this bone graft was then impacted into place in the interspace between the 5th and 6th cervical vertebra. All bleeding was controlled with electrocautery and the neck wound was then closed over a Penrose drain with interrupted 000 chromic catgut sutures in the platysma and subcutaneous tissue and a running 000 subcuticular wire. The hip wound was closed there with interrupted 0 chromic catgut sutures in the periosteum and deep fascia and interrupted 000 chromic catgut sutures in the subcutaneous tisues (sic) and a running 00 nylon suture in the skin. Modified compression dressings were applied. The patient was awakened and returned to the Recovery Room in good condition."

(13) A "surgical pathology report" of T. L. Sandow, M.D., dated August 5, 1970, and reading as follows:

"PRE-OPERATIVE DIAGNOSIS

DEGENERATIVE JOINT DISC DISEASE OF CERVICAL SPINE, C5–C6

POST-OPERATIVE DIAGNOSIS
TISSUE SUBMITTED        DISC FROM C5–C6

GROSS: The specimen consists of ten fragments of soft pale pink fibrillar tissue ranging up to 0.8 cm. in greatest dimension.

In the same container is an irregular fragment of concellous and cortical bone measuring 0.8 cm. in greatest dimension. The soft tissue is submitted for microscopic.

RJC:mrb

MICROSCOPIC: Sections are of hyaline cartilage and fibrocartilage showing focal eosinophilia of the matrix.

DIAGNOSIS: 1. Nucleus pulposus.
2. Bone fragments."

(14) A "radiology report", dated August 5, 1970, by Jay I. Rozen, M.D. reading as follows:

"Two films have been in the Operating Room of the cervical spine in the lateral projection during the process of anterior fusion. The film marked #1 shows a hypodermic needle overlying the interspace between C–6 and C–7. The film marked #2 shows the hypodermic needle removed. A towel clip partially obscures the interspace between C–5 and C–6, but a bone graft appears to have been placed in the anterior aspect of the interspace."

(15) A "radiology report" dated August 7, 1970, by John W. Walker, M.D., stating as follows:

"Films of the cervical spine made in the lateral projection show evidence of the anterior interbody fusion lying between C–5 and 6. The position of the graft in relationship to the vertebral bodies is quite satisfactory.

IMPRESSION: ANTERIOR INTERBODY FUSION C–5/6 IN SATISFACTORY CONDITION."

(16) A "radiology report" by Dr. Walker made on August 12, 1970, containing the following findings:

"Films of the cervical spine made to compare with an earlier examination on 8–7–70 shows that the anterior bone graft between C–5 and C–6 assumes the same satisfactory relationship with the vertebral bodies that was seen at our earlier examination.

IMPRESSION: ANTERIOR INTERBODY FUSION, C–5–C–6 IN SATISFACTORY CONDITION."

(17) Letter of Dr. Sandow dated September 21, 1970, stating as follows:

"Mrs. Doris M. Hughes was first seen and examined on June 4, 1970. The patient had been hospitalized in Research Hospital by Dr. Thomas Hunt and I was called in consultation to

see her concerning her persistent neck and shoulder pain and headaches. The patient stated that two years prior to her hospitalization she had experienced severe right neck and shoulder pain following a fall at a skating rink. The pain became so severe that the patient was unable to use her arms and hands in her work as a legal secretary and had not worked for the past two years. The patient stated that she had pain also into the left shoulder and arm. The pain did not extend down into the hands and fingers. There was no paresthesias or numbness unless the patient would sleep with the right arm up over her head. Coughing and sneezing did aggravate the pain. The patient stated that she had some difficulty in sleeping, but this was not marked. The patient had received initial treatment and diagnosis for a right tennis elbow and she was given medications and several injections. This did not help the condition. The right shoulder had also been injected, and she had had multiple chiropractic treatments including traction of the cervical spine, and manipulations. None of these treatments had improved her.

"Examination on June 4, 1970 revealed a full active and passive ROM of both shoulders. The patient had some pain in the shoulder with external rotation and abduction. The patient demonstrated a grade 2 limitation of left lateral flexion and left rotation of the cervical spine. The other motions of the cervical spine were within normal limits. There was some slight diffuse tenderness over the paravertebral muscles in the cervical area. No discernible muscle weakness in the upper extremities and the DTR were present and equal. There were no sensory deficits. The patient did have some tenderness over the anterior lateral aspect of the right shoulder and over the right lateral humeral epicondyle. However, she did not experience pain over the lateral humeral epicondyle with resistance to dorsiflexion of the right wrist.

"X-rays of the spine and shoulders were obtained in the hospital and these demonstrated some degenerative joint and disc disease at the C–5–6 level. There was no pathology noted in the x-rays of the shoulders. Patient had a thorough neurological examination by Dr. Hunt and cineradiograms of the cervical spine were obtained. The neurological examination did not disclose any nerve root irritation and the cineradiogram demonstrated some abnormality in the mobility of the cervical spine.

"The patient was placed in a special neck brace as a test to see whether she would be a candidate for anterior cervical fusion at the degenerative area of the cervical spine. The patient was dismissed from the hospital in the brace. She was followed as an outpatient.

"On July 7, 1970, the patient was seen in the office and was completely free from her neck, shoulder and arm pain. She still experienced some tenderness about the elbow. I felt that she had obtained an excellent result from the use of the brace; therefore, this brace was discontinued at that visit.

"The patient was again seen on July 24, 1970 at which time she had had a recurrence of her symptoms, including the headaches, back pain, and shoulder pain. I felt that this was sufficient evidence to warrant proceeding with an anterior cervical fusion on the basis of abnormal mobility and degenerative joint and disc disease of the cervical spine. She was admitted to the hospital on August 4, 1970, and on August 5, 1970, an anterior cervical fusion at the C–5–6 interspace was performed. Post-operatively the patient did well, and she was dismissed from the hospital within a weeks time, to be followed as an outpatient.

"On August 21, 1970, the patient was seen in the office and x-rays revealed that the fusion was healing well. The donor site on the hip was well healed and all the sutures were removed. On September 4, 1970, the patient returned for a recheck and was getting along well. X-rays revealed that the graft was well situated and incorporating nicely. The patient was instructed to remain in her cervical brace for another three weeks time, at which time she was to be placed into a soft cervical collar and begin more mobilization of her neck.

"Mrs. Hughes has responded well to the surgery and treatment so far, and I would expect a good result from this. With any type of fusion of the spine there will be definite limitation of motion and some permanent disability. However, it is too soon to evaluate this at present. It is also my opinion that the patient was disabled from the condition for which we operated on her, from June of 1968 to the present time."

*Initial Denial and Reconsideration*

Plaintiff's claim was initially denied by the Social Security Administration on July 16, 1969. Plaintiff then requested reconsideration, stating:

"I am unable to sit or stand for more than 15 or 20 minutes at a time. I don't know of any employer who would allow me to work under these conditions. I am also unable to type or take shorthand. The pain in my right arm allows me to write only a few words."

The Administration later noted that:

"The [claimant] has not submitted any additional medical evidence, although she had indicated, at the time of filing of a reconsideration request, that she would do so. Since the prior medical information was sufficiently evaluated at the time of the prior determination, the determination of 7/11/69 is affirmed as written."

Under date of November 18, 1969, the following letter was sent to plaintiff by the Director of the Division of Reconsideration of the Social Security Administration, denying her claim for benefits:

"In view of your request for reconsideration, all the information about your claim has been carefully evaluated. It has been determined that the previous decision was proper under the law.

"In applying for disability insurance benefits, you stated that you became unable to work June 30, 1968 due to a back condition. The medical evidence in your case includes reports from your treating physicians and the results of a special examination obtained for you. This information confirms that you have been treated for a back condition. However, physical examination reveals no severe limitation of motion of your back or major joints. There is no ·swelling, heat or abnormality of your upper extremities and special tests reveal no neurological injury. There is no evidence of severe muscle weakness or wasting and your gait and station were observed to be normal. There is no evidence of any other condition so severe as to materially restrict your normal daily activities.

"Records indicate that you have a 10th grade education and have worked as a legal secretary. While we recognize that you may have discomfort at times, the medical evidence does not demonstrate any impairment so severe as to prevent your returning to your usual work or to any other gainful employment within your vocational or educational experience. Therefore, it has been determined that you are not disabled, as that term is defined by the law.

"If you believe that the reconsideration determination is not correct, you may request a hearing before a hearing examiner of the Bureau of Hearings and Appeals. If you want a hearing, you must request it not later than 6 months from the date of this notice   .   .   ."

*The Hearing*

After initial denial of the claim and denial on reconsideration, a hearing was held on February 27, 1970, at plaintiff's request before a hearing examiner of the Bureau of Hearings and Appeals. In the hearing, both plaintiff and her husband testified. Plaintiff testified that she had done secretarial work and had worked as a secretary to Charles Williams, an attorney, until June 1968, when she:

" . . . asked him for a leave of absence for the summer because my arm was bothering me, but I didn't tell him that because I wanted my job back. I told him I needed a rest and that my children needed me at home. The first of August I advised him I didn't think I would be able to return because the pain in my arm increased to the point that I could hardly use it at all.

\* \* \* \* \* \*

"Q So you haven't really worked since the last of June of '68?

"A No, sir. I returned to his office a couple of times to help his new girl to get started on the bookkeeping.

"Q After August?

"A Yes. But just as a favor to help set them up. No actual work.

"Q Would you work how long when you went back to show them?

"A Only be two or three hours.

"Q Was this during the summer or the fall?

"A Actually, it was the first of the following year.

"Q You mean in '69?

"A Yes.

"Q Early part?

"A Yes." (Tr. 46–47)

Plaintiff further testified that she had suffered "extreme pain" in her right arm since the spring of 1968 (Tr. 49); that her condition was "about the same" as it had been for a year, "except recently I have experienced dizzy spells and trouble with my eyes" (Tr. 52); that she

cannot type—"I have tried to at home as I have my own typewriter and I have not been able to"—cannot take shorthand, and it is painful for her to do so (Tr. 52); and that she can do minor household tasks, but it is painful for her to do so. Plaintiff's husband, Billy Hughes, testified that her condition was worse than it had been a year ago; that plaintiff's pain is not so severe that she has to take pain pills and aspirin but that it increases with movement of her arm and in cold weather (Tr. 56).

*Decision of the Hearing Examiner*

The hearing examiner, based on the hearing and the above medical evidence, except the reports described in paragraphs (6), (7), (9), (10), (11), (12), (13), (14), (15), (16) and (17), above (which were considered only by the Appeals Council), made a decision adverse to plaintiff on April 22, 1970. In support of the decision, the hearing examiner stated as follows:

"This case is before the Hearing Examiner upon the request for hearing filed as of December 12, 1969 by Doris M. Hughes, the claimant, appealing in a determination by the Social Security Administration denying her application for disability insurance benefits. A hearing was held on February 27, 1970, in Kansas City, Missouri, at which time the claimant appeared and participated. Also appearing and testifying was the claimant's husband, Billy Hughes.

"The record reveals claimant filed an application for disability insurance benefits as of April 24, 1969 stating she became unable to work as of June 30, 1968 due to a back condition. This application was denied by the Social Security Administration, initially and on reconsideration, and claimant was notified by letters dated July 16, 1969 and November 18, 1969. She was also advised she would meet the earnings requirement for disability purposes until March 31, 1973.

"The issue before the Hearing Examiner is whether or not the claimant is entitled to a period of disability and/or

disability insurance benefits as set forth in Sections 216(i) and 223 of the Social Security Act, as amended."

## "APPLICABLE STATUTORY PROVISIONS

"In both Sections 216(i) (providing for the establishment of a period of disability) and 223(d) (providing for the payment of monthly disability insurance benefits) it is provided that: 'the term "disability" means—(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; . . . '

"It is further provided in Section 223 (d) that 'an individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, his education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or several regions of the country.' The same section provides that 'for the purpose of this subsection a "physical or mental impairment" is an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.'

"The Act further specifically provides that the claimant has the burden of proof. In an additional provision of this same section of the law it is provided that 'an individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.' [1]"

1. The foregoing provisions, as last amended by the 1967 amendments became effective with respect to applications filed in or after January or those which were filed before January 1968, if the applicant had not died before such month and if notice of final decision of the Secretary of Health, Education, and Welfare has not been given to the applicant before such month, or if given before such month, a civil action with respect to such final decision is commenced in or after such month if the decision or such final action has not become final before January of 1968.

## "FACTS

"This 40-year-old claimant, her husband, and three children, ages, 17, 16, and 10 years, live in a two-story, three-bedroom house in Kansas City, Missouri. The claimant's husband is employed and his wages constitute the family's sole income.

"The claimant testified that she completed the tenth grade of school and attended a business school for three months, taking shorthand and typing. She worked as a typist while attending business school. While attending high school, she worked at the Kansas City Public Library. Her main occupation has been that of a secretary.

"The claimant stated that from 1956 to 1965, she worked for a construction machinery supply and repair company as a secretary. She used a typewriter, adding machine, TWX machine, calculators, and assisted in the bookkeeping department; she transcribed from dictating equipment and also took shorthand and was the switchboard operator. Bad feelings arose in the company, and the claimant resigned her position. She next worked at the ladies' auxiliary for the Veterans of Foreign Wars as a secretary. After working eleven months, she had pneumonia and wanted to rest, resigned and stayed at home.

"From February 1967 to June 1968, the claimant worked for an attorney-at-law

in Kansas City, Kansas. She was the attorney's secretary and did all the bookkeeping and record keeping for his law business and also for the attorney's real estate properties. She worked half days and received $200 a month. In June 1968, she asked for leave of absence because her arm hurt and her children needed her at home. The attorney let her have the summer off, but she was to return in September. However, her arm continued to pain her, and on August 1, 1968, she told the attorney she would not return to work. In the early part of 1969, when tax reports were made, she did go back to the attorney's office and show the new girl how to make out the tax reports. She went back three or four times and worked from one to two hours at a time and received $10.

"The claimant testified that she is unemployable because of her right arm impairment. She stated that she did not receive an injury to the arm and first noticed the impairment in the spring of 1968. She found that she could not write shorthand because her fingers cramped. She has extreme pain mostly in the elbow region and in the fingers.

"The claimant stated that Dr. Bernard M. Abrams' report (exhibit 13) is in error where Dr. Abrams stated that her history was that she fell on her arm two years ago. The claimant stated that she did not fall on her arm but fell on her tailbone badly dislocating it.

"The claimant stated that Dr. Chernoff was her first doctor and later she went to Dr. Janes, a chiropractor, in Independence, Missouri. Dr. Janes told her that she had a damaged disc in back of her neck, misplaced vertebra, and arthritis, which was causing her trouble. The claimant stated that under Dr. Janes' treatment, the pain had been helped some, but it was still there. She still has weekly treatments by Dr. Janes, and the treatments consist of his rubbing her back and neck area. Dr. Janes did not prescribe any medicine.

"The claimant testified that the pain and restriction of motion of her right arm was about the same now as it was a year ago. In addition, she now has dizzy spells and trouble with her eyes. Dr. Janes told her this was probably due to pressure on the nerves in her back. She tried to type at home and practice her shorthand, but she does not have the dexterity in the right hand, and her typing speed is nil. She stated that she is right handed.

"The claimant testified that she does her housework when she can, cooks all the meals, and drives a car. She shops for groceries, and her husband has to carry the groceries to the car. She runs the vacuum cleaner and does the laundry in an automatic washer. Her children do all the ironing as she cannot do it. Sometimes in dressing she has to have help to fasten her dress in the back as she cannot reach behind her with her right arm. Also, she needs help with fixing her hair because her arm hurts when she reaches above her head. She can get her hands above her head but cannot keep them there for any length of time. She stated that she could work if she did not have the right arm trouble.

"David Hughes, the claimant's husband, testified that his wife's condition was worse than it was a year ago. He stated that she did not have as much pain, but there was more restriction to movement of her right arm. He explained that when his wife does heavy work, the pain was worse and she gets cold. He stated that his wife drives to and from Dr. Janes' office, a distance of five miles each way. This witness stated that Dr. Chernoff's medical report did not show that injections were given and worked in reverse, claimant's hands swelled so bad that she had to remove her rings."

## "SUMMARY OF MEDICAL EVIDENCE

"A medical report submitted by Selbert G. Chernoff, M.D., dated April 29, 1969, showed that claimant was first examined on December 3, 1968, and examined on two occasions in December 1968. Dr. Chernoff stated that claimant had tenosynovitis of right elbow, extensors, flexors, and supinator involvement as well as

mild bursitis of right shoulder. The claimant was given an anti-inflammatory medication, told to restrict use of her hand, and given injections in elbow and shoulder with mixed steroids. A report submitted by Thomas A. Gaines, chiropractor, dated June 9, 1969, shows that claimant was first examined on January 21, 1969, and is still under Dr. Janes' care. This report shows that x-rays were made which revealed degenerating disc between the fifth and sixth cervical vertebrae with loss of normal curvature; beginning arthritis in the region of the fifth and sixth cervical vertebrae, as well as the eleventh dorsal and first lumbar vertebrae. Dr. Janes believed that claimant's problem was a nerve pressure of a severe and chronic nature, with likelihood of nerve damage. He found the upper and lower extremities were normal in size and contour, reflexes were normal; tenderness at the seventh cervical vertebra with right musculature spasm. Diagnoses were subluxation of the fifth cervical and second dorsal vertebrae, causing neuritis and neuralgia of the brachial plexus, right; and beginning arthritis.

"A report submitted by Bernard A. Abrams, M. D., neurologist, shows that claimant was examined on July 2, 1969. Examination revealed claimant to be a well-developed, well nourished lady appearing to be about her stated age. The doctor felt that there was some psychogenic overlay. Examination of the right upper extremity revealed no swelling, heat, or other abnormality, and full range of passive motion; on the raising the right upper extremity above claimant's head, there was some pain on full abduction and external rotation except for guarding, the muscle power was intact; there was no sensory abnormality in any extremity and no abnormal tone in the muscles. Gait, station, and the remainder of the neurological examination was entirely within normal limits. In conclusion, Dr. Abrams pointed out that he suspected claimant had some type of fibromyocitis or tendonitis of the right acromial bursa at the onset of her ill-

ness, and that this was so severe this caused some referred or sympathetic pain. The doctor did not feel that she has a brachial plexitis or ever had one. He found no signs of atrophy or other nerve root involvement. The doctor was of the opinion that if claimant had been vigorously treated with steroid injections and local heat, her present status would be considerably better. He stated that she does have some pain on movement of the right upper extremity, and this is her main limitation, and that this is an extremely limiting disability in a patient who was previously a stenographer. Final diagnosis was neurological disease, none; possible neuromuscular disease; acromial tendonitis and bursitis. The prognosis was good."

## "EVALUATION OF THE MEDICAL EVIDENCE

"Drs. Chernoff (internist) and Abrams (neurologist) found claimant's impairment to be tenosynovitis and bursitis of the right upper extremity. Dr. Janes, a choropractor, (sic) found that claimant's right upper extremity impairment was due to subluxation of the fifth, cervical and second dorsal vertebrae, which caused neuritis and neuralgia of the brachial plexus, right. Drs. Chernoff and Abrams felt that injections would relieve the claimant's condition, whereas Dr. Janes felt that chiropractic adjustments and physiotherapeutic treatment would ease claimant's pain and discomfort."

## "DISCUSSION

"At the hearing, it was observed that claimant appeared no older than her stated age, did not appear to be acutely or chronically ill, and her testimony indicated an education far beyond the tenth grade of school. She did not appear to be quite concerned about her right arm impairment and the fact that this impairment prevented her from continuing work as a legal secretary.

"The claimant's work experience shows that she has performed various jobs in office work in addition to taking short-

hand and typing. She has worked as a bookkeeper, switchboard operator, made tax returns, kept books and records, operated an adding machine and calculators. Also, she was able to train new employees in the work they were to perform in an office. While claimant's right arm impairment probably precludes her from typing and taking shorthand dictation, there are many office jobs which she can perform, such as a receptionist, as well as many other types of office work. Since June 1968, she has remained at home as a housewife, looked after her three children, cooked the meals, laundered clothes, shopped for groceries, drove a car, and performed most of her housework.

"The Hearing Examiner might very well find that claimant cannot perform the full duties of a secretary in an office because she cannot type or take shorthand. However, there are many office jobs for which the claimant is qualified in offices which do not require typing and taking shorthand. Therefore, the Hearing Examiner cannot find that claimant is precluded from engaging in her usual occupation or that she is precluded from all substantial gainful activity by reason of her impairment. The claimant is 40 years of age, has a business school education, and has successfully worked as a secretary for many years. Jobs for which she is qualified are available in the Kansas City area."

### "FINDINGS

"Considering the evidence in its entirety, the Hearing Examiner finds that the claimant's impairments, since June 30, 1968, have not been of such severity as to preclude her from engaging in any substantial gainful activity and that since June 30, 1968, she has not been under a disability as defined by the Social Security Act, as amended."

### "DECISION

"Based on the foregoing findings, it is the decision of the Hearing Examiner that the claimant, Doris M. Hughes, is not entitled to the establishment of a period of disability or to disability insurance benefits under sections 216(i) and 223 of the Social Security Act, as amended, based on her application of April 24, 1969."

Subsequently, plaintiff appealed the decision to the Appeals Council of the Bureau of Hearings and Appeals, Social Security Administration. On the letter requests of plaintiff's counsel dated November 13, 1970, and December 21, 1970, the Appeals Council considered the medical reports described in paragraphs (6), (7), (9), (10), (11), (12), (13), (14), (15), (16) and (17), *supra*, including the letter of Theodore L. Sandow, M. D., dated September 21, 1970, and the Research Hospital and Medical records for Mrs. Hughes' admission on June 3, 1970, and August 1, 1970. Subsequently, on January 28, 1971, the Appeals Council affirmed the decision of the hearing examiner. The following findings and conclusions were made:

"This case is before the Appeals Council on the claimant's request for review of the hearing examiner's decision dated April 22, 1970. The hearing examiner held that the claimant was not entitled to a period of disability or to disability insurance benefits under applicable provisions of the Social Security Act.

"The claimant filed an application for a period of disability and for disability insurance benefits on June 26, 1970, alleging inability to work from June 30, 1968, because of 'compressed disc causing pinching of nerves in spine causing inability to use both hands and blackout if turn head too quick.'

"The hearing examiner's statements in his decision as to the pertinent provisions of the Social Security Act, the issues in the case and the evidentiary facts which were before him, are incorporated herein by reference.

"Evidence in addition to that which was before the hearing examiner, which was submitted in behalf of the claimant, has

been introduced into the record as follows:

Exhibit AC–1 Medical Report dated June 27, 1970, signed by John E. Linville, D. O.

Exhibit AC–2 Research Hospital and Medical Center report, covering the period from June 3, 1970 to June 8, 1970.

Exhibit AC–3 Research Hospital and Medical Center Reports, Progress Notes, Orders for Treatment, Graphic, Medication and Nurses' Records and consultation reports for June 1970.

Exhibit AC–4 Research Hospital and Medical Center Record, with laboratory and other records, covering the period from August 1, 1970 to August 12, 1970.

Exhibit AC–5 Medical report dated September 21, 1970, signed by Theodore L. Sandow, M.D."

## "STATEMENT OF THE LAW AND ISSUES

"Section 216(i) and 223 of the Social Security Act define 'disability' (except for certain cases of blindness) as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"Section 223(d) (2) (A) provides that 'an individual (except a widow, surviving divorced wife, or widower for purposes of section 202(e) or (f)) shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.'

"Section 223(d) (3) of the Act provides that:

'For purposes of this subsection, a physical or mental impairment is an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.'

"The general issues before the Appeals Council are whether the claimant is entitled to a period of disability and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act. The specific issues are whether the claimant was under a 'disability,' as defined in the Act, and if so, when such 'disability' commenced and the duration thereof; and whether the special earnings requirements of the Act are met for the purpose of entitlement.

"The claimant's earnings record shows that the special earnings requirements of the Act were met from a time prior to June 30, 1968, when the claimant allegedly became unable to work, and that these requirements continue to be met on the date of this decision."

## "SUMMARY OF THE EVIDENCE

"The claimant stated that she was born on November 12, 1929, and that she has a 10th-grade education. She also attended business school for 3 months, studying typing and shorthand. She worked as a typist at the Kansas City Public Library, and thereafter her principal occupation has been as a legal secretary.

"The claimant alleges that she suffered a fall in a skating rink, resulting in severe right neck and shoulder pain, which

became so severe that she was unable to use her arms and hands in her work.

"In December 1968, the claimant was sent by an internist who diagnosed tenosynovitis of the right elbow extensors and flexors with supinator involvement, and mild bursitis of the right shoulder (Exhibit 11).

"She was then followed in the Pennell Chiropractic Clinic beginning January 21, 1969, where subluxation of the 5th cervical and 2nd dorsal vertebrae with neuritis and neuralgia of the right brachial plexus, and beginning arthritis, were diagnosed (Exhibit 12).

"On July 2, 1969, a consultative examination by a neurologist was performed, and the specialist concluded that the claimant had severe fibromyositis or tendinitis of the right acromial bursa at the onset of her illness, causing referred or sympathetic pain. In the examiner's opinion the claimant did not have a brachial plexitis at that time and he did not think that she had ever had one. In his further opinion her main limitation is pain on movement of the right upper extremity, but with no signs of atrophy or other nerve root involvement. As a final diagnosis the specialist concluded that there was possible neuromuscular disease, i. e., acromial tendinitis and bursitis, but no neurological disease (Exhibit 13).

"On November 18, 1969, the claimant secured a report based in part on X-rays taken in January 1969. The reporting physician, an osteopath, concluded that degenerating disc disease between the 5th and 6th cervical vertebrae, with loss of normal curvature, indicated continual residual weakness (Exhibit 16).

"Exhibit AC–1 is a report dated June 27, 1970, which indicates that the claimant was given a 6-week trial-period in a cervical brace, surgery to be carried out if there was no adequate response.

"A myelogram revealed a possible unstable cervical spine, during a June 1970 hospitalization (Exhibit AC–2).

"Laboratory reports and other records of hospitalization, covering the period June 3, 1970 to June 8, 1970, also indicate a possible unstable cervical spine, with difficulty at the C5, C6 level (Exhibit AC–3).

"The claimant was again hospitalized from August 1, 1970 to August 12, 1970, because of continued complaints of neck pain and headaches. An anterior interbody fusion, C5, C6 was done, and she was discharged in satisfactory condition (Exhibit AC–4).

"The report of an orthopedic surgeon, dated September 21, 1970, states that the claimant had considerable relief following an anterior cervical fusion on August 5, 1970, and that a good result was anticipated. An X-ray taken on August 21, 1970, revealed that the fusion was healing well, the donor site on the hip was well healed and all sutures were removed. On September 4, 1970, X-rays revealed that the graft was well situated and incorporating nicely. The claimant was instructed to remain in her cervical brace for another 3 weeks, after which time she was to be placed in a soft cervical collar (Exhibit AC–5)."

## "EVALUATION OF THE EVIDENCE

"A review of all of the medical evidence now of record discloses that the claimant has required hospitalization and treatment for impairments described as acromial tendinitis and bursitis, and degenerative disc and joint disease of the cervical spine C5, C6. She has had mild to moderate degenerative disc disease of the cervical area, with mild subacromial bursitis, and tendinitis of the right shoulder, and mild bursitis of the right elbow, but there has been no evidence of disc herniation in the cervical region or any significant degree of nerve root compression which would be so painful as to preclude all forms of work activity. The medical evidence fails to indicate that degree of severity based on clinical tests and laboratory findings which would support the claimant's allegation that she has had an impairment which precluded her from engaging in substantial gainful activity for a continuous period of 12 months.

"The record shows the probability of discomfort because of degenerative cervical disc disease and tendinitis of the right shoulder, limiting the claimant since June 30, 1968, to light to moderate activity which did not require lifting over 25 pounds, repetitive neck movements, or use of the right hand above the shoulder level. The evidence fails to establish that the claimant has an impairment or impairments which singly or in combination are demonstrable by medically acceptable clinical and laboratory diagnostic techniques to be of such severity as to have prevented her from engaging in all gainful activity on a sustained basis.

"Although the claimant was obviously unable to work during the period she was in the hospital in June 1970, when she was readmitted to the same hospital on August 1, 1970, and immediately thereafter during her period of convalescence, the record does not establish that inability to engage in substantial gainful activity for a period of 12 months or longer will continue following the August 1970 surgery, when considered in the light of the rate of medical improvement demonstrated since that surgery.

## "FINDINGS OF THE APPEALS COUNCIL

"After careful review of all of the evidence now of record, the Appeals Council makes the following findings:

1.  The claimant's application for a period of disability and disability insurance benefits was filed on June 26, 1970.
2.  The claimant meets the special earnings requirements of the Act at all pertinent times.
3.  The medical record establishes that the claimant's chief impairment is musculoskeletal in nature.
4.  The claimant's impairment does not prevent her from engaging in substantial gainful activity of the type for which she is fitted by education and her previous work experience.

5.  Such work exists in significant numbers in the region where the claimant lives.
6.  The evidence fails to establish that the claimant has been prevented from engaging in substantial gainful activity by reason of any medically determinable impairment, which has lasted or can be expected to last for a continuous period of at least 12 months beginning on or before the date of this decision.
7.  The claimant was not under a 'disability' within the meaning of the Social Security Act, at any time prior to the issuance of this decision.

## "DECISION OF THE APPEALS COUNCIL

"It is the decision of the Appeals Council that, based on her application filed on June 26, 1970, the claimant is not entitled to a period of disability or to disability insurance benefits under the provisions of sections 216(i) and 223, respectively, of the Social Security Act. The hearing examiner's decision, as herein supplemented, is affirmed."

As noted above, it is this decision of the Appeals Council which stands as the final, reviewable decision of the Secretary within the meaning of § 405(g), *supra.*

### *Standards of Review*

■ Section 405(g), *supra,* provides for judicial review of the final decision of the Secretary of Health, Education, and Welfare, in the following terms:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."

The decision of the defendant can be affirmed on review by this Court if the following seven standards are met:

(1) the hearing procedures were fair and lawful, Jacobson v. Folsom (S.D.N.Y.) 158 F.Supp. 281;

(2) evidence was received on the material factual issues, Fenix v. Celebrezze (W.D.Mo.) 243 F.Supp. 816;

(3) the findings of fact are supported by substantial evidence, Celebrezze v. Bolas (C.A.8) 316 F.2d 498;

(4) the findings of fact are sufficient to resolve the crucial factual issues, Hayes v. Celebrezze (C.A.5) 311 F.2d 648, 654, as well as crucial legal issues;

(5) the correct legal standards were applied in determining the ultimate issues, Ferran v. Flemming (C.A.5) 293 F.2d 568, 571;

(6) all regulations of defendant applied in arriving at the decision were lawful and valid as applied in this case, Marion v. Gardner (C.A.8) 359 F.2d 175;

(7) it appears in finding the facts that claimant was required to sustain no greater burden of proof than proof by a preponderance of the evidence, the usual burden in administrative proceedings. Sec. 7(c), Ad.Proc.Act; Sec. 556(d), Title 5, U.S.C.; Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed. 362.

On these requirements see Pollard v. Gardner (W.D.Mo.) 267 F.Supp. 890 at 903.

■ The decision of the defendant must be reversed, considered in the light of the above standards, for the following reasons:

(1) An incorrect legal standard was applied when the Appeals Council determined that plaintiff was not disabled from performing "all gainful activity." See §§ 416(i) and 423, Title 42, U.S.C., which define "disability" as "inability to engage in any *substantial* gainful activity by reason of any medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." But, as noted above, the finding of the Appeals Council was as follows:

"The evidence fails to establish that the claimant has an impairment or impairments which singly or in combination are demonstrable by medically acceptable clinical and laboratory diagnostic techniques to be of such severity as to have prevented her from engaging in *all gainful activity* on a sustained basis." (Tr. 8)

While the Appeals Council also made in its decision a formal finding in the language of §§ 416(i) and 423, *supra,* it is readily apparent that it was based upon the above erroneous legal supposition that the plaintiff was required to prove that her disability was severe enough to preclude her from "all gainful activity." This placed on plaintiff the burden of proving greater severity of disability than that required by the statute. See Hendrix v. Finch (D.S.C.) 310 F.Supp. 513, 515, 516, concerning the difference in difficulty of proving inability to perform "gainful activity" and "any substantial gainful activity." In that case, it was noted that, in contrast to the provisions of §§ 402(e) and 423(d) (2) (B), Title 42, U.S.C., whereby a widow claimant "must show that her impairments are of such severity as to be disabled 'from engaging in any gainful activity,'" Section 423(d) of the same title provides that the disability need only preclude engaging in any *substantial* gainful activity. The Court concluded:

"Thus it appears that Congress intended that Section 423(d) (2) (B) be more strictly applied than Section 423 in establishing disability, in that the individual must be precluded under the former Section from engaging in any gainful activity, while under the latter Section one must be unable to engage in any substantial gainful activity."

See also Henry v. Richardson (E.D. Tenn.) 320 F.Supp. 296, 297; Frasier v. Finch (N.D.Ala.) 313 F.Supp. 160, 162, to the following effect:

"Congress apparently intended that Section 423(d) (2) (B) be more strictly applied than Section 423 . . ." 313 F.Supp. at 162.

Therefore, in applying the stricter standard applicable to widow's disability benefits to plaintiff's claim for disability benefits, the Appeals Council applied an incorrect and inappropriate legal standard.

■ (2) If the subsequent formal finding of the Appeals Council that

"The evidence fails to establish that the claimant has been prevented from engaging in substantial gainful activity by reason of any medically determinable impairment, which has lasted or can be expected to last for a continuous period of at least 12 months beginning on or before the date of this decision".

can be considered independently sufficient to support the determination that plaintiff is not entitled to benefits and untainted by the finding that the medical evidence does not show a disability to engage in "all gainful activity" the finding is not supported by substantial evidence. Plaintiff testified without contradiction that she had been unable to return to her former employment as a legal secretary because of her inability to type or take shorthand sufficiently since the "early part" of 1969. The medical evidence of record is unanimous that she suffers either osteoarthritis, prearthritic conditions, or osteoarthritic changes in her right arm and interspaced vertebrae with pain, and has suffered those conditions since at least late April 1969. All of the medical evidence and testimony is consistent with the conclusion that plaintiff was prevented from engaging in substantial gainful activity. The Appeals Council concedes in this respect that:

"The record shows the probability of discomfort because of degenerative cervical disc disease and tendinitis of the right shoulder, limiting the claimant since June 30, 1968, to light to moderate activity which did not require lifting over 25 pounds, repetitive neck movements, or use of the right hand above the shoulder level."

Their finding that plaintiff was nonetheless not prevented from engaging in substantial gainful activity must therefore necessarily be predicated on the proposition that other substantial gainful activity which plaintiff can perform is available in the region where the plaintiff lives or in several regions of the country. As provided in § 423(d) (2) (A):

"An individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."

The Appeals Council has accordingly made a finding that:

"such work exists in significant numbers in the region where the claimant lives."

But no evidence of the availability of jobs suitable to plaintiff's degree of impairment, her age, education and work experience in this region or in several regions of the country exists anywhere in the record of the proceedings before the defendant. This crucial finding, then, is not supported by substantial evidence.

■ (3) Plaintiff has been required to prove her entitlement to benefits by more than a preponderance of the evidence. As noted above, plaintiff has offered evidence showing that (a) she suffered from a medically determinable physical impairment dated from June 30, 1968, (b) by reason of which she has not been able to work at her former occupation since at least the early part of 1969. All of the medical reports and evidence offered in the administrative proceedings and recited herein support this conclusion. No opinion was expressed by any of the physicians that plaintiff was not disabled and all of their findings tend to prove disability of the right arm, pain, and some "psychogenic overlay." Dr. Sandow specifically found plaintiff to be disabled in his report of September 10, 1970, and opined that she had been so disabled since June of 1969. Defendant contends that the opinion is not controlling. In his brief in this Court, it is contended:

"Dr. Sandow's opinion that the plaintiff was disabled, while helpful, certainly was not conclusive. This Court in Covey v. Celebrezze, [235] 355 F. Supp. 871, 877 (W.D.Mo.1964), stated:

'The question of disability is not ordinarily to be determined by the opinion evidence of experts. Domann v. Secretary of H.E.W., 220 F.Supp. 252 (W.D.Mo.1963), although if such evidence is *uncontroverted,* a decision to the contrary must be set aside as speculative. Kohrs v. Flemming, 272 F.2d 731 (8th Cir. 1959).

'In this case, however, the opinion evidence is not totally in accord.'"

The opinion evidence need not be "conclusive". To require a plaintiff to prove her case by "conclusive" opinion evidence even though it is uncontroverted and fairly preponderated requires proof by an unlawful excessively high burden of proof.

Defendant, in the same brief, points to certain subsidiary findings of Dr. Sandow in his letter of September 21, 1970, and in his prior progress reports pointing out, generally in conclusory equivocal terms, that the operation was healing "nicely" and that the anterior interbody fusion after the operation was "satisfactory." But none of the subsidiary findings is inconsistent with an opinion of disability. There is no opinion evidence or other evidence indicating that plaintiff has not been disabled for more than the space of a year. To emphasize the subsidiary findings is to ignore the entire constellation of plaintiff's ailments, including pain and other ill-effects of her disability considered as a whole. "All complaints must be considered together in determining her work capacity." Burns v. Celebrezze (W.D. N.C.) 234 F.Supp. 1019; Haskins v. Finch (W.D.Mo.) 307 F.Supp. 1272, 1279, and cases there cited.

■ (4) The findings of fact are not sufficient to resolve the substantial issues. As noted above, there was no evidence in the record respecting the availability of jobs in the "national economy" which were suitable to plaintiff's level of employment. Accordingly, the Appeals Council made no specific finding respecting what plaintiff could do and what employment potential existed which was within her ability. These findings are necessary in a case in which a claimant succeeds in showing that he is not able to return to his former employment because of his disability. See K. Davis, Administrative Law § 16.07:

"In a social security disability case, a decision that the claimant failed to show that he could not follow his usual occupation . . . requires no further findings, although, according to cases . . . an express finding with respect to what the claimant can do and what employment opportunities are open to him is required when the claim is denied but a finding is made [or proper] that the claimant is unable to engage in his usual occupation."

In this respect, the Appeals Council also did not make a finding on the issue of whether or not plaintiff was able to return to her former employment. This, too, was a failure to make a necessary

finding. Weaver v. Finch (W.D.Mo.) 306 F.Supp. 1185, 1193. But, as noted above, that finding would be compelled in this case by uncontradicted evidence.

▇▇▇ (5) With respect to pain, the Appeals Council applied an erroneous legal standard. In evaluating the evidence, the Appeals Council stated:

"A review of all of the medical evidence now of record discloses that the claimant has required hospitalization and treatment for impairments described as acromial tendinitis and bursitis, and degenerative disc and joint disease of the cervical spine C5, C6. She has had mild to moderate degenerative disc disease of the cervical area, with mild subacromial bursitis and tendinitis of the right shoulder, and mild bursitis of the right elbow, *but there has been no evidence of disc herniation in the cervical region or any significant degree of nerve root compression which would be so painful as to preclude all forms of work activity.*" (Emphasis added.)

Pain alone can be disabling. Sayers v. Gardner (C.A.6) 380 F.2d 940, 23 A.L. R.3d 1014. And, for the reasons noted in paragraph (1) above with respect to disability generally, plaintiff was not obligated to prove that pain precluded her from *all* gainful activity in order to prove disability by reason of pain. Further, she was not obligated to show that her pain was based upon such organic impediments as "disc herniation" or a "significant degree of nerve root compression." Pain, whatever its source, can be disabling. Ferrell v. Gardner (C.D. W.Va.) 260 F.Supp. 996, 23 A.L.R.3d at 1053. The source of a claimant's pain is not material. Combs v. Gardner (C.A. 6) 382 F.2d 949, 956. In demanding that plaintiff show a basis for her pain in objective evidence, the Appeals Council applied an erroneous legal standard. See Dunn v. Richardson (W.D.Mo.) 325 F. Supp. 337.

(6) The finding of the Appeals Council that the disability of plaintiff ended after the anterior cervical fusion which was performed on her on August 5, 1970, is without any support in the evidence of record. The radiology reports made afterward showed improved bone structure, but the finding and conclusion of the surgeon who performed the operation, Dr. Sandow, was that the plaintiff was still disabled and had been disabled since June of 1968. No other evidence, opinion or otherwise, in the record in this case is inconsistent with or contrary to that opinion. Under the authorities cited and relied on by defendant, the opinion therefore preponderates and is controlling. Covey v. Celebrezze, *supra.* See also: Colwell v. Gardner (C.A.6) 386 F.2d 56.

For the foregoing reasons, the decision of the Secretary should be reversed. The Secretary will be directed to award benefits to plaintiff from June 30, 1968, the date on which, according to the findings of the Appeals Council, plaintiff began to suffer "degenerative cervical disc disease and tendinitis of the right shoulder, limiting [her] to light to moderate activity," to the date of the decision of the Appeals Council. No remand to permit the defendant to take evidence showing the presence of suitable job opportunities in this region or in several regions of the country is warranted. The rule that once a claimant shows his disability to return to his former employment, the burden of going forward with production of evidence on the issues is on the defendant to show that suitable specific employment for claimant's age, education, work experience, intellectual capacity and degree of disability exists in the national economy is of some long standing. See Bethune v. Finch (W.D.Mo.) 302 F.Supp. 425; Haskins v. Finch (W.D.Mo.) 307 F.Supp. 1272, and cases therein cited. Cf. Davis Administrative Law § 16.07.

▇▇▇ The recent decision of the United States Court of Appeals for the Eighth Circuit in Miller v. Finch (C.A. 8) 430 F.2d 321, is consistent with that rule. In the *Miller* case the Secretary recognized and complied with the burden of going forward with evidence of the claimant's ability to perform other sub-

stantial gainful activity available in the national economy by producing the testimony of a vocational expert and eliciting other material evidence. In that case, it was held that:

"The burden of proof has always been on the claimant to establish his right to disability benefits. This has been the law both prior and subsequent to the 1967 Amendments . . . There is no shifting of the burden of proof, but in any case it would not matter as the evidence here justified the Secretary's decision.

"It seems to be indicated by claimant's brief that he is under the impression that the Secretary is required to show that jobs exist within a reasonable distance from claimant's home and that claimant would be employed if he applied for such jobs. The law does not require this. Under the Act a person is not disabled entitling him to payments if he can engage in any other kind of substantial gainful work which exists in the national economy." 430 F.2d at 323, 324.

See also Vaughn v. Finch (C.A.6) 431 F.2d 997, clarifying the rule as follows:

"It is the law of this Circuit and of other Circuits that when it is established that a claimant's disabilities foreclose resumption of his usual employment, the burden of going forward shifts to the Secretary, who must present evidence of available employment which he contends can be performed by the claimant in his lessened capacity." 431 F.2d at 998.

Thus, it is well established and clear that, when plaintiff showed her inability to return to her former occupation because of her disability, the burden is on defendant to go forward by production of some evidence of other suitable employ-ment in the national economy unless some already exists in the record. None appears in the record under review. Defendant has assumed the risk of failing to produce such evidence in the face of the above prior decisions of this and other courts and should not therefore now be given a second opportunity to cover its failure. Further, as noted above, no substantial evidence exists to show the availability of suitable jobs in the national economy. Although the burden of proof in the primary sense of risk of non-persuasion may remain on the plaintiff the burden of going forward with production of evidence on this specific issue of fact shifts to defendant. Haskins v. Finch (W.D.Mo.) 307 F.Supp. 1272, 1283. Further, remand is not justified when there has been ample opportunity to take evidence on the issues, Bethune v. Finch, *supra*, at 437, and cases there cited, and when the record shows plaintiff to be entitled to benefits by an overwhelming preponderance of the evidence, as in the case at bar. *Id.*

For the foregoing reasons, it is

Ordered that defendant's motion for summary judgment be, and it is hereby, denied. It is further

Adjudged that the decision of the Secretary be, and it is hereby, reversed, and that defendant award plaintiff disability benefits in accordance with a finding of disability from June 30, 1968, the benefits to begin at the end of the six-month waiting period thereafter, to and including January 28, 1971, the date of the decision of the Appeals Council. Defendant is requested to compute the amount of benefits accordingly due and to report the amount to the Court. Plaintiff's counsel should formally move for an allowance of attorney's fees, justifying any amount claimed by him by reference to his expended time and effort in this case.